**UNITED STATES v. 62 PACKAGES, MORE OR LESS, OF MARMOLA PRESCRIPTION TABLETS.**

**No. 8357.**

Circuit Court of Appeals, Seventh Circuit.

May 4, 1944.

108

Rockwell T. Gust and David A. Howell, both of Detroit, Mich., and W. H. Dougherty, of Janesville, Wis., for appellant.

John J. Boyle, of Madison, Wis., and Alvin M. Loverud, of Washington, D. C., for appellee.

Before MAJOR, MINTON, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Claimant seeks to reverse a judgment condemning "Marmola" drug tablets entered in a proceeding under the Federal Food, Drug, and Cosmetic Act, c. 675, 52 Stat. 1040, 21 U.S.C.A. § 301 et seq. The essential averments of the libel were that the tablets were misbranded in that (1) when used as prescribed they are dangerous to health; (2) they are falsely represented to be a safe and appropriate remedy for obesity; and, (3) the instructions for use fail to reveal facts material with respect to the consequences which may arise upon the use of the drug as prescribed, thus violating Sections 502 (a), 502 (j) and 201 (n) of the Act.[1]

The Government complained of the printed matter on the packages and in the circulars accompanying them. The directions on the box read: "Take one tablet before each meal and at bed time with enough water to swallow easily or as directed by a physician. Marmola is recommended only as a treatment for adult fat persons whose excess fatness is caused by hypothyroidism with accompanying subnormal metabolic rates but who are otherwise normal and healthy. Marmola should not be taken by persons suffering from any abnormal condition except abnormal excess fat caused as above stated. We make no diagnosis as that is the function of your physician who must be consulted for that purpose. Marmola is not recommended for children. Before taking be sure to read the enclosed circular."

The instructions in the circular are more detailed; only the part which it is necessary to consider is quoted: "* * * Marmola

---

[1] Section 502: "A drug or device shall be deemed to be misbranded—(a) If its labeling is false or misleading in any particular."

Section 502: "A drug or device shall be deemed to be misbranded—* * * (j) If it is dangerous to health when used in the dosage, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."

Section 201: "For the purposes of this Act—* * * (n) If an article is alleged to be misbranded because the labeling is misleading, then in determining whether the labeling is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling relates under the conditions of use prescribed in the labeling thereof or under such conditions of use as are customary or usual."

is not sold as a cure-all. It is intended for use only by obese (obesity is the term used by the medical profession for an excessive development of fat throughout the body) persons who are otherwise normal and healthy and whose obesity is caused by hypothyroidism with accompanying subnormal metabolism, and our statements and representations made herein or otherwise are strictly limited to this treatment under these conditions and according to the dosage as recommended. We do not make any diagnosis as that is the function of your physician, who must be consulted for that purpose. Marmola should not be taken by persons suffering from any abnormal condition except obesity (abnormal excess fat) caused as above stated."

"Important Directions
"First

"Take one Marmola Tablet before each meal and one at bedtime—four a day. Do this regularly.

"Second

"For best results we recommend that Marmola be used as directed over a period of sixty to ninety days—if needed that long.

" * * * No food, drug or other substance which has any physiological effect may be taken internally or applied externally without the possibility of unpleasant or harmful results in some persons if they happen to be constituted so that they do not tolerate the food or other substance. Such a condition can not always be predicated either by physicians or others. If any unpleasant effects are experienced stop taking Marmola until they disappear, then resume taking one-half of the former dosage or consult a physician."

"Suggestions.

" * * * The idea that excess fat is always due solely to laziness or gluttony has been dissipated by science. One may be active and eat moderately and still grow fat, if a deficiency exists which causes too much food to be converted into fat instead of energy.

"Marmola is a time-tested aid to correct this basic cause of the abnormal excessive fat accumulated by reason of the deficiency it is designed to correct."

"When to Stop

" * * * But you are the best judge of the weight at which you feel the best and are most efficient. Stop taking Marmola as soon as you lose your abnormal excess weight. If, later, you should start to gain again take more Marmola tablets until conditions are corrected."

" * * * Consult your physician if any unusual circumstances or conditions arise."

"Your doctor, of course, is opposed to self-medication. He may prefer to write his own prescription for some special case, but the Marmola prescription has been developed by over 30 years of experience and its efficiency has been tested by the sale of over 20,000,000 boxes throughout the world."

■ Our essential question is whether the evidence is such as to justify us in saying as a matter of law that the District Court's finding that Section 502 (j) of the Act has been violated because Marmola tablets, when used in the dosage and with the frequency and for the duration prescribed, recommended or suggested in their labeling, are dangerous to health is erroneous. Obviously the finding should not be set aside unless clearly against the weight of the evidence. Rule 52(a) Rules of Civil Procedure, 28 U.S.C.A. following Section 723: Sauder v. Dittmar, 10 Cir., 118 F.2d 524; United States v. State Street Trust Co., 1 Cir., 124 F.2d 948; Super Mold Corporation of California v. Bacon, 9 Cir., 130 F.2d 860; Stork v. Townsend, 6 Cir., 132 F.2d 859; Wertz v. National City Bank of Evansville, Ind., 7 Cir., 115 F.2d 65, certiorari denied 311 U.S. 675, 61 S.Ct. 41, 85 L.Ed. 434.

■ Claimant has sold this medical concoction for more than thirty years as a reducing aid for persons whose obesity is supposed to be caused by hypothyroidism and have an accompanying subnormal metabolism. "Hypothyroidism", resulting from under-functioning of the thyroid gland, is accompanied by a subnormal metabolic rate and such symptoms as dryness of the skin, scarcity of hair and eyebrows, sluggishness of physical and mental reactions, decreased appetite, slower pulse rate and characteristic changes in the composition of the blood, and, in advanced stages, by a puffy and swollen appearance of the face and other parts of the body due, not to increased fatty tissue, but to mucoid fluid deposited beneath the skin. "Metabolism" denotes the sum total of all processes of the human body by which food is transformed into chemicals in turn absorbed into the blood stream and lymphatic system for the purpose of so nourishing the body that

it can continue to function. In other words, it is the aggregate of all processes whereby food is digested, heat and energy created, the body built up or repaired and waste matter excreted. By examination of the rates at which normal persons give off heat, scientists have established the normal rate of metabolism from which, experience has revealed, most persons deviate by not more than 10 per cent. To enjoy good health, one's body must maintain a proper balance of essential chemicals; the thyroid gland is the primary agency in achievement of this end. Excess of the thyroid hormone in the blood stream results in hyperthyroidism and too little in hypothyroidism.

The only ingredient of the condemned drug with which the proceeding was concerned is the desiccated thyroid included in the formula. This is derived from the glands of hogs and sheep, and has the same effect upon one's physical make-up as the hormones produced by a human gland. The potency of desiccated thyroid is roughly proportional to its iodine content. The product here contains approximately 0.3% of organic iodine and thus possesses one and one-half times the potency of that made in accord with the standard of the U. S. Pharmacopoeia.

Qualified authorities and specialists in medicine, chemistry and nutrition, supplied testimony, somewhat in conflict, relating to the cause and "cure" for obesity, hypothyroidism and hyperthyroidism and to metabolism, as well as proof of the effect of thyroxin upon persons suffering from Graves' Disease, heart disease, amenorrhea and psychoneuroses. The evidence discloses that an overdosage of desiccated thyroid produces hyperthyroidism. Indeed, as to this there can be no question, since such medication supplies an excess of the hormone. The record also reveals that medical men are in agreement that one person's tolerance for the drug may be a great deal less than another's. Claimant recognizes this, too, since, in the circular, it warns, "No food, drug or other substance which has any physiological effect may be taken internally or applied externally without the possibility of unpleasant or harmful results in some persons if they happen to be constituted so that they do not tolerate the food or other substance. * * * If any unpleasant effects are experienced stop taking Marmola until they disappear * * *."

Medical witnesses testified as to further effects of overdosage, such as increased metabolism of the patient, injuriously affecting the functioning of the endocrine glands, kidneys and liver; impairment of bodily functions because of the extra burden placed upon human organs; symptoms which can not be distinguished from those peculiar to hyperthyroidism, such as rapid heart, heart pains, nervous and emotional instability, nausea, menstrual disturbances; serious aggravations which result in persons who consider themselves normal and healthy, but are actually subject to such latent diseases as heart disease, diabetes, or tuberculosis, when they use desiccated thyroid. Indeed, their testimony is largely to the effect that a daily dosage of two grains a day is dangerous to health. Lay witnesses gave vivid reports of the effect of the tablets upon their health. Weakness, heart palpitations, amenorrhea, emotional nervous states, and domestic difficulties were described as aftermaths of the use of the tablets. One witness reduced her weight from 165 pounds to 95 pounds, then ceased to take the tablets, but continued to lose until she weighed only 50 pounds. The testimony of toxic effect of desiccated thyroid in prescribed Marmola dosage was conflicting. Clinical tests by Dr. Killian and Dr. Allen, in which the amount of the hormone were greatly increased, were said to reveal no harmful and lasting results.

■ We think the evidence such as to justify only the conclusion reached by the trial court. We certainly are not justified in saying that the finding is erroneous as a matter of law. Admittedly, taking four tablets a day, is not dangerous to the health of all users, since tolerance for the drug varies; but the experience of various witnesses, all of whom took tablets according to the directions on the label, as well as the testimony of a number of medical experts, inevitably impel one to the finding that use of the tablets as prescribed is dangerous to the health of the public. The fact that some users may be able to tolerate greater quantities, as the experiments conducted by Dr. Killian and Dr. Allen tend to show, does not militate against the conclusion, for Section 502 (j) does not require that the drug be dangerous to the health of all who take it in the dosage and for the duration prescribed or recommended. It devolved upon the trial court to determine only whether it was proved that the drug is dangerous to the public health at large if used as recommended by its vendors. United States v. Lexington

Mill & Elevator Co., 232 U.S. 399, 34 S. Ct. 337, 58 L.Ed. 658, L.R.A. 1915B, 774.

The trial court further found the tablets subject to condemnation under Section 502 (a), in that they were misbranded because they were falsely represented to be a safe and appropriate remedy for obesity, when in fact they are not, for the reason that obesity is not caused by the lack of any substance which Marmola supplies; and, under Section 201 (n), in that the labels did not reveal facts material with respect to possible consequences of use of the tablets under the conditions prescribed, since the instruction to discontinue use of the tablets upon appearance of "unpleasant effects" does not prevent the occurrence of more serious symptoms as a result of the hyperthyroidic condition previously precipitated. It is unnecessary to discuss these findings, since the judgment must be sustained for violation of Section 502 (j). For the same reason, we find it unnecessary to consider other contentions regarding Sections 502 (a) and 201 (n).

Claimant makes much of the proposition that the legislative history of the Federal Food, Drug, and Cosmetic Act discloses that Congress had no intent to deprive individuals of the right of self-medication. This we think beyond the point, for the decision of the lower court deprives no one of this right. It merely determines that Marmola tablets are dangerous to the public health when used in the dosage and with the frequency prescribed by claimant. What would be a nondeleterious prescription was not agreed upon by the experts and was not within the province of the court to decide.

The judgment is affirmed.